UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

ALEXANDER WILLIAMS,             :
                    Plaintiff,    :
                              :           14-CV-7158 (JPO)
            v.                     :
                              :       OPINION AND ORDER
THE CITY OF NEW YORK, *et al.*,    :
                              :
                  Defendants. :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

       Plaintiff Alexander Williams brings this action pursuant to 42 U.S.C. § 1983 alleging

false arrest, malicious prosecution, and failure to intervene by New York Police Department

(NYPD) Detectives Edwin Perez and Jason Baker.[1]  (Dkt. No. 13.)  Defendants now move for

summary judgment on all claims.  (Dkt. No. 28.)  For the reasons that follow, the motion for

summary judgment is granted.

I.

       The following facts are undisputed unless otherwise noted.  On the evening of November

28, 2012, a robbery occurred at the Allen Deli on East 161st Street in the Bronx.  (Dkt. No. 33 ¶

1.)  Two individuals perpetrated the robbery, one of whom displayed and discharged a firearm.

(*Id.* ¶ 2.)

       During the course of the robbery, Louis Montalvo—an off-duty Emergency Medical

Technician employed by the New York City Fire Department—walked by the Allen Deli and

---

[1] Although the Amended Complaint also asserted claims against the City of New York and
Officers Evigaldy Rodriguez and Richard Fialkovic, Williams dropped claims against these three
Defendants.  (Dkt. No. 32 at 1.)

1

peered in through the glass door.  (*Id.* ¶¶ 4-5.)  From that vantage point, he observed the robbery for, at a minimum, five to six seconds.  (*Id.* ¶ 13.)  Montalvo later became a key witness in the investigation of the robbery, but the parties dispute what, precisely, Montalvo observed.

Both sides agree that Montalvo related the following account at a deposition taken in connection with this case.  When he approached the door of the Allen Deli, Montalvo saw an employee of the store "laying prone, his hands behind his back by the ATM machine."  (Dkt. No. 34-2 at 13:9-13:14.)  He then "looked up, [and] observed a heavy set African-American male with . . . a black hoodie and a bandana on his face pointing what appeared to be an automatic weapon [at] the gentleman that was behind the register."  (*Id.* at 13:16-13:24.)  He also saw "another gentleman holding another weapon on the opposite side of the counter within the store."  (*Id.*)

According to his deposition testimony, at first Montalvo could see only "the left side of [the heavy-set man's] face."  (*Id.* at 14:12-14:24.)  However, when Montalvo put his "his hand on the door, the door made kind of a noise" and the heavy-set man "looked toward [Montalvo]."  (*Id.*)  The two men looked "directly" at one another through the "perfectly clear" glass of the door.  (*Id.* at 14:23-15:22.)  Montalvo was able to see the heavy-set man's eyes for "[a] matter of seconds" before he fled.  (*Id.* at 16:8-16:16.)  Montalvo observed that the man wore his hair in braids, and observed his face from the bridge of his nose and up, as a bandana covered the lower portion of his face.  (*Id.* 19:8-20:9.)  Montalvo would later identify the man as Williams, the plaintiff in this case.  Although Montalvo testified that he also saw the other perpetrator of the robbery, he was not able to provide a clear description of the second man.  (*Id.* at 18:12-18:17.)

Williams disputes the accuracy of Montalvo's account, arguing that security camera footage taken from the Allen Deli reveals flaws in Montalvo's testimony, most notably that he would not have been able to see the "larger robber"—the one he later identified as Williams—but only the second "smaller robber."  (Dkt. No. 32 at 15-19.)

After leaving the scene of the Allen Deli, Montalvo came upon two NYPD officers a few blocks away and informed them of the robbery he had just witnessed.  (Dkt. No. 33 ¶¶ 14-15.) The officers immediately responded to the location, but by the time they arrived the perpetrators had left.  (*Id.* ¶ 17.)  The officers interviewed deli employees and "conducted a canvass of the area with one of" them.  (*Id.* ¶ 17.)  One employee provided a description of the perpetrators, "specifically that one was a black or Hispanic male, approximately six feet tall, heavy, wearing a black leather jacket, his hair in braids or cornrows, and holding a gun, and the other was black or Hispanic, smaller and thinner, wearing a grey or tan jacket, and both perpetrators had bandanas over their faces."  (*Id.* ¶ 18.)

Thereafter, Defendant Baker arrived at the scene, spoke with the employees and the other NYPD officers, and obtained and reviewed the security camera video footage of the incident. (*Id.* ¶¶ 20, 21.)  The security camera footage depicts, among other things, the two assailants entering the deli, the larger assailant waiving a gun around, most of the employees lying down on the ground, the larger perpetrator pointing the gun at a deli worker behind the counter, the larger perpetrator taking cash from the register, and an EMT (Montalvo) approaching the deli and peering through the door.  (*Id.* ¶ 22.)

Approximately two hours after the robbery, an NYPD detective interviewed Montalvo. (*Id.* ¶ 23.)  According to a summary of that interview prepared by the detective, Montalvo related

what he had witnessed that night, including that he had "observed a male black, wearing a black bandana, displaying a semi[-]automatic firearm." (Dkt. No. 34-5.) Montalvo's description matched the tape from the surveillance video, which showed "two males. One heavyset, [with] bushy eyebrows, dark skin, [a] black male, or black Hispanic [male]" who wore braids, "and [a] second defendant [who] seemed to be thinner and taller." (Dkt. No. 34-3 at 35:18-36:9.)

The following day, Baker created a "wanted" flyer with still images of the assailants taken from the security camera footage and posted the flyers in the neighborhood around the deli. (Dkt. No. 33 ¶ 25.) In addition, a video clip from the security camera footage was sent to local news outlets. (*Id.* ¶ 26.)

On December 12, 2012, an anonymous woman called the 44th Precinct and stated that she saw a local news report about the robbery and recognized the heavy-set perpetrator as Williams. (*Id.* ¶ 27.) According to the caller, she knew Williams because they had, at one time, dated. (*Id.*) The caller said that Williams was in his 30s, resided in Queens, and that she had recently seen him in the vicinity of the Allen Deli. (*Id.*)

Acting on this tip, Detective Baker created a photo array using a photograph of Williams alongside the photos of five other individuals. (*Id.* ¶ 28; Dkt. No. 29, Ex. M.) Detective Baker showed the photo array to Montalvo, who identified Williams as the perpetrator of the robbery that he had witnessed with a gun. (Dkt. No. 29, Ex. D at 37:2-39:23; Dkt. No. 29, Ex. G at 69:4-14.) Montalvo was told prior to looking at the photo array that the police "had an idea of who committed the crime" but he was not told that a photo of that suspect was included in the photo array. (Dkt. No. 29, Ex. D at 51:17-53:8.)

Following this identification, an "Investigation Card" was issued for Williams stating that there was probable cause to arrest him for the robbery based upon the positive photo identification, and that he was believed to be armed and dangerous.  (Dkt. No. 33 ¶ 30.) Williams was not located until September 6, 2013, when he was arrested in Queens on the unrelated charge of having an open container of alcohol in public.  (*Id.* ¶ 32.)

On September 7, 2013, while still in custody, Williams was placed in an in-person lineup. (*Id.* ¶ 33-36.)  The lineup consisted of six black men, including Williams, all of whom were given black hats to put on their heads and were instructed to hold a long black garbage bag in front of the lower halves of their faces.  (*Id.* ¶ 37.)  Upon viewing the lineup, Montalvo identified Williams as the man he had observed at the Allen Deli.  (Dkt. No. 29, Ex. D at 42:20-53:24.) Montalvo also recognized Williams as the man in the photo array.  (*Id.* at 53:9-53:21.)

Williams was then arrested for the robbery and transported to Central Booking.  (Dkt. No. 33 ¶ 39.)   At the time of the arrest, Williams weighed approximately 230 pounds and was approximately 5'10" tall.  (*Id.* ¶ 40.)

A criminal court complaint was drafted by the Bronx County District Attorney's Office against Williams and on September 8, 2013, he was arraigned on charges that included robbery in the first degree.  (*Id.* ¶ 42.)  On September 9, 2013, Williams was released on bail.  (*Id.* ¶ 43.) On May 6, 2014, the underlying criminal charges against Williams stemming from the Allen Deli robbery were dismissed.  (*Id.* ¶ 45.)

Williams initiated this action by filing a Complaint on September 5, 2014.  (Dkt. No. 2.) On October 26, 2015, Defendants filed their motion for summary judgment.  (Dkt. No. 28.)

Defendants seek summary judgment on all three of Williams' remaining claims: false arrest, malicious prosecution, and failure to intervene.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The existence of probable cause is a complete defense to an action for false arrest brought under § 1983. *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368-69 (2d Cir. 2007) (collecting cases). Moreover, "even if there was no probable cause for the arrest, a police officer is shielded by qualified immunity in a false arrest case if *arguable probable cause* existed." *Smith v. Cty. of Nassau*, No. 15-1251-CV, 2016 WL 1040150, at *1 (2d Cir. Mar. 16, 2016) (per curiam) (emphasis added). "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well established

6

law.'" *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (quoting *Lee v. Sandberg*, 136

F.3d 94, 102 (2d Cir. 1997)); *see Smith*, 2016 WL 1040150, at *1; *Escalera v. Lunn,* 361 F.3d

737, 743 (2d Cir. 2004) ("Arguable probable cause exists 'if either (a) it was objectively

reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable

competence could disagree on whether the probable cause test was met.'") (quoting *Golino v.

City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

      "When information is received from a putative victim or an eyewitness, probable cause

exists unless the circumstances raise doubt as to the person's veracity." *Feehan v. Lengyel*, 278

F. App'x 47, 49 (2d Cir. 2008) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir.

2001)).  Absent circumstances that cast doubt on the reliability of an identification, such as an

unduly suggestive procedure, "positive photo identification by an eyewitness is normally

sufficient to establish probable cause to arrest." *Celestin v. City of New York*, 581 F. Supp. 2d

420, 431 (E.D.N.Y. 2008); *see Stansbury v. Wertman,* 721 F.3d 84, 90-01 (2d Cir. 2013);

*Norwood v. Mason*, 524 F. App'x 762, 765 (2d Cir. 2013) ("[P]hoto identification of a person

provides the police with probable cause to arrest that person, even where the identification may

not be 100% reliable."); *Candelario v. City of New York*, No. 12-CV-1206, 2013 WL 1339102,

at *5 (S.D.N.Y. Apr. 2, 2013) ("An eyewitness's unequivocal identification of an individual as

the perpetrator of the crime generally establishes probable cause, as long as it is reasonable to

believe the eyewitness under the circumstances.") (citation and quotation marks omitted).

Indeed, "[f]or the purposes of determining whether an identification can support probable cause,"

as opposed to the more exacting inquiry into whether evidence of an identification should be

admissible in a criminal trial, "the basic question is whether the identification procedure was 'so

defective that probable cause could not reasonably be based upon it.'"  *Stansbury*, 721 F.3d at 91

n.7 (quoting *Jenkins v. City of New York,* 478 F.3d at 76, 93 (2d Cir. 2007)).

It is beyond genuine dispute that Defendants possessed the "arguable probable cause"

that entitles them to qualified immunity on Williams' false arrest claim.  *Smith*, 2016 WL

1040150, at *1.  Shortly after the incident, Montalvo provided a description of the robbery scene

that matched the description provided by deli employees and the security camera footage.  (Dkt.

No. 29-4, Ex. H.)  After images of the robbery were publicized, an anonymous caller contacted

the NYPD and identified Williams as one of the perpetrators.  (Dkt. No. 33 ¶¶ 26-27.)  Acting on

this information, Detective Baker created a photo array using a photograph of Williams

alongside five other individuals.  (*Id.* ¶ 28.)  From this photo array, Montalvo identified Williams

as one of the perpetrators.  (*Id.* ¶ 29.)  Following his later arrest on an unrelated charge, Williams

was placed in a lineup consisting of six men, all of whom were given black hats to put on their

heads and instructed to hold a long black garbage bag in front of the lower halves of their faces

to simulate the bandana covering the face of the man Montalvo observed in the Allen Deli.  (*Id.*

¶¶ 33-37.)  Upon viewing the lineup, Montalvo identified Williams as a perpetrator of the

robbery.  (*Id.* ¶ 38.)  Following this in-person identification procedure, Williams was arrested on

robbery charges.  (*Id.* ¶ 39.)  Based on Montalvo's positive identifications of Williams, "a

reasonable police officer in the same circumstances and possessing the same knowledge as

[Defendants] could have reasonably believed that probable cause existed in light of well

established law.'"  *Cerrone*, 246 F.3d at 202-03.

Williams offers various arguments in support of his position that summary judgment is

inappropriate.  First, Williams argues that the security camera footage taken from the Allen Deli

reveals flaws in Montalvo's testimony, most notably that Montalvo would not have been able to see the "larger robber"—the one he later identified as Williams—but only the second "smaller robber." (Dkt. No. 32 at 15-19.) According to Williams, Defendants should have discovered these inconsistencies when they reviewed the security camera footage and, as a result, should not have relied on Montalvo's identification as a basis for probable cause.

But the security camera footage confirms, rather than contradicts, Montalvo's description of what he observed. In context, Montalvo testified as follows:

> [W]hen I looked up, I observed a heavy set African-American male with, I believe, a black hoodie and bandana on his face pointing what appeared to be an automatic weapon [at] the gentleman that was behind the register. When I took an actual second look, I see there is another gentleman holding another weapon on the opposite side of the counter within the store."

(Dkt. No. 32-2 at 13:16-13:24). Apparently seizing on Montalvo's use of the word "opposite," Williams argues that Montalvo inaccurately described the larger robber as being on the "customer" side of the counter. (Dkt. No. 32 at 15-16.) The security camera footage reveals that, at the moment Montalvo peered into the deli, both the larger and smaller perpetrators were on the employee side as opposed to the customer side of the counter. (*See* Dkt. No. 29, Video 5 at 11:54:08-11:54:18.) But Williams cites no instance in which Montalvo described the location of the larger robber as being on the customer side of the counter, and the more natural interpretation of Montalvo's use of the term "opposite," especially in light of the security camera footage, is that Montalvo meant to convey that the larger and smaller robber were at different *ends* of the counter, even if both were on the employee side.

Williams also argues that the footage shows that Montalvo would only have been able to see the smaller robber, not the larger robber, from Montalvo's position at the door of the deli.

(Dkt. No. 32 at 18.)  What the footage actually demonstrates is that the larger robber was, as Montalvo testified, "pointing . . . [a] weapon [at] the gentleman that was behind the register" at the time that Montalvo was peering inside the store.  There is no basis on which to conclude that the larger robber was unobservable from Montalvo's position.  (Dkt. No. 32-2 at 13:15-13:24; Dkt. No. 29, Video 5 at 11:54:08-11:54:18.)  In sum, the security camera footage bolsters Montalvo's credibility as an eyewitness, thereby making Defendants' reliance on Montalvo as a basis for establishing probable cause more, rather than less, objectively reasonable.

Next, Williams argues that the photo and lineup identifications were unduly suggestive and therefore could not have established probable cause.  As for the photo identification, Williams contends that the procedure was tainted by suggestive statements made by the police. In particular, Williams notes that Detective Perez allegedly told Montalvo prior to the photo array that the police "had an idea of who committed the crime" and that this suspect may have been responsible for other robberies in the area.  (Dkt. No. 32-2 at 34:12-34:22.)  However, Montalvo also testified that the police did not provide any specific details about the suspect, that the police did not indicate that the suspect's picture was in the photo array, and that Montalvo did not assume that the suspect's picture was in the photo array.   (*Id.* at 51:17-53:8.)  Unlike the cases Williams invokes, there is no suggestion in this case that "the police told [the witness] that he had to pick someone . . . ." *Jenkins*, 478 F.3d at 93.  Rather, the police officers appear to have told Montalvo only what any eyewitness would intuit when shown a photo array: that a photograph of a suspect may be included.  In any event, although "the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do so."  *Id.*

Williams also argues that the photo array was unduly suggestive because only one of the six photos in the array—the photo of Williams—depicted a person with braids.  (Dkt. No. 32 at 11.)  "A photo array is improperly suggestive if 'the picture of an accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'"  *United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996) (quoting *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994)).  Having carefully reviewed the photo array at issue (Dkt. No. 29, Ex. M), the Court determines that no rational jury could conclude that the photograph of Williams is "so distinctive a component of the array as to suggest unnecessarily that [Williams] must be the suspect," and that, as a consequence, Montalvo's identification was impermissibly suggestive.  *United States v. Adeniyi*, No. 03-CR-0086, 2003 WL 21146621, at *2 (S.D.N.Y. May 14, 2003).  The photo array is composed of six photographs of black men, all of whom appear to be of a similar age range, many of whom share a similar skin tone and build, and two of whom appear to keep their hair in braids.  (Dkt. No. 29, Ex. M.) Although Williams' hair appears the longest of the six, its length is not pronounced.  *Cf. Eltayib*, 88 F.3d 157 (finding an array impermissibly suggestive where the witness's only salient description of a suspect was his pronounced "head full of hair" and only one photo in the array depicted a man with such hair).  It cannot be said that, based on the variation in hair length at issue here, the photograph of Williams "so stood out from all other photographs" as to render the photo identification procedure improperly suggestive.  *Id.* at 166.  Even if Williams were the only man depicted with braids, the Court cannot say that his hairstyle in the photograph is so distinctive, or Montalvo's observation that the larger robber wore braids so salient an aspect of his description, that the photo identification procedure was thereby rendered improper.

11

Finally, while Williams suggests that the photo array identification procedure was tainted, he offers little reason to doubt the integrity or reliability of the September 7, 2013 lineup identification procedure, at which Montalvo again identified Williams.  As explained above, Williams was placed in a lineup consisting of six men, all of whom were given black hats to put on their heads and instructed to hold a long black garbage bag in front of the lower halves of their faces to simulate the bandana covering the face of the man Montalvo observed in the Allen Deli.  (Dkt. No. 33 ¶¶ 33-37.)  Upon viewing the lineup, Montalvo identified Williams as a perpetrator of the robbery.  (*Id.* ¶ 38.)

Given the absence of "circumstances that would raise doubt" as to the veracity of Montalvo's identification of Williams, the rule that eyewitness identification "is typically sufficient to provide probable cause" controls this case.  *Stansbury*, 721 F.3d at 90-91.  There is no genuine dispute that Defendants had at least arguable probable cause to arrest Williams in connection with the robbery of the Allen Deli.  As a result, Defendants are entitled to qualified immunity and summary judgment on Williams' false arrest claim.  *Jenkins*, 478 F.3d at 88 ("[S]ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable."); *Thompson v. City of New York*, 603 F. Supp. 2d 650, 657 (S.D.N.Y. 2009).

Defendants are also entitled to summary judgment on Williams's malicious prosecution claim.  "The existence of probable cause is a complete defense to a claim of malicious prosecution . . . ."  *Manganiello v. City of New York*, 612 F.3d 149, 161-02 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  The Court's determination that there was arguable probable cause to defeat Williams's false arrest claim also precludes his

12

malicious prosecution claim, as Defendants are equally entitled to qualified immunity. *Virgil v. Town of Gates*, 455 F. App'x 36, 39-40 (2d Cir. 2012); *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011).

It also follows that Defendants are entitled to summary judgment on Williams's failure to intervene claim. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Usavage v. Port Auth. of New York and New Jersey*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested . . . ." *Id.* at 559 (citing *Anderson,* 17 F.3d at 577). However, "[i]f the Court determines that the officer's conduct did not violate a constitutional right . . . . the analysis ends." *Feinberg v. City of New York*, No. 99-CV-12127, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004); *see Usavage*, 932 F. Supp. 2d at 599 ("Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim.") (internal citation and quotation marks omitted). In the qualified immunity context, "[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997). Further, "the failure to intercede must be under circumstances making it objectively unreasonable for [the officer] to believe that his fellow officers' conduct did not violate those rights." *Id.*

13

Having determined that there was at least arguable probable cause to arrest Williams—in other words, that "a reasonable police officer in the same circumstances and possessing the same knowledge as [Defendants] *could* have reasonably believed that probable cause existed," *Cerrone*, 246 F.3d at 202-03—it cannot be said that Defendants' failure to intervene was "objectively unreasonable," *Ricciuti*, 124 F.3d at 129.  Defendants are therefore entitled to summary judgment on Williams' failure to intervene claim is.

III.

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to close the motion at docket number 28 and to close this case.

SO ORDERED.

Dated: June 7, 2016
New York, New York

_____
J. PAUL OETKEN
United States District Judge